UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No:  23-CR-10202-FDS |
| | ) | |
| STACIE-MARIE LAUGHTON, | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

In May 2023, Stacie-Marie Laughton, a convicted felon who had once held political office, rekindled a secret romance with Lindsay Groves, a daycare teacher, in defiance of a New Hampshire Stalking Protection Order that prohibited their contact.  After a matter of mere weeks, Laughton and Groves conspired to—and did—produce child pornography featuring three toddlers in Groves's care, capitalizing on Groves's position of trust to exploit the children for the couple's own sexual gratification.

For the reasons discussed below and in the victim impact statements filed under seal, and for reasons to be articulated at the sentencing hearing, the government respectfully requests that this Court impose a term of incarceration of 480 months (40 years) and 60 months (five years) of supervised release.

### FACTS

The government relies on and incorporates the facts as set forth in the statement of offense conduct in paragraphs 14 through 39 of the Presentence Investigation Report ("PSR").

Essentially, the defendant, a former New Hampshire state representative,[1] used her access

---

[1] Before and after the defendant's two-year tenure as a state representative, she worked at McDonald's and was otherwise chronically unemployed.  PSR ¶¶ 183-189.  The defendant indicates that she did not draw a salary but received "some sponsorship and additional income" from her position online radio station.  *See* PSR ¶¶ 101, 140, 184.

to Lindsay Groves, a teacher at a childcare facility in Tyngsborough, Massachusetts, to create pornographic imagery of three toddler students.  In the midst of a weeks-long text-based conversation where Groves and Laughton discussed their mutual sexual interest in the children and what they would like to do with the children, Groves followed through on what they had discussed: she took the children into the bathroom, where no one would see what she was doing, and she created graphic imagery of the children's genitals with her cell phone.  She then sent the photographs to Laughton, and the two used the images to fuel their sexually-motivated conversations.

These crimes only came to light when Laughton reported them in an apparent attempt to punish Groves for ending their relationship.  Just a few days after their last text exchange, in which the couple angrily broke up, the defendant told a member of her peer support team[2] and the Nashua Police that Groves had sent the four sexually explicit photographs in the weeks leading up to the report, and later deleted the texts from her phone.[3]  PSR ¶¶ 14-19.  The defendant, of course, did not disclose her own role in the creation of the imagery.

Law enforcement was able to recover thousands of messages between the defendant and Groves spanning several weeks in May and June 2023, first from Groves's phone, and then from Laughton's.  The messages demonstrate an active relationship in which they discuss past sexual encounters and explicit descriptions of sex with each other and others, both real and fantasy; talk about various indicia of their personal relationship, including about sharing expenses, joint access to accounts, and professions of their love for each other; and argue with each other, including

---

[2] Laughton was ordered to engage in counseling/participation with the agency as a condition of probation for at least one of her 2022 convictions.  PSR ¶ 100.

[3] *See generally* Gov. Sent. Memo. Exh. B, attached, which shows that the messages were deleted on June 20, 2023 at 8:45 pm.

regarding the demise of their relationship.  The messages also included explicit discussion about and transfer of child pornography featuring Minors 1, 2, and 3, all of whom were at the time three-year-old students at the childcare facility.

When law enforcement confronted the defendant with the content of the messages—which, presumably, the defendant erroneously assumed would not be accessible once she deleted them—the defendant first claimed that she was "going along with" Groves, but later admitted to her participation as "coaxing" Groves.  PSR ¶ 25.  She ultimately admitted that she told Groves to touch one child's penis, and claimed that she was feeding Groves's attraction to children.  *Id.*

## DISCUSSION

### I.    Sentencing Guideline Calculation

Based on its assessment of the defendant's total offense level as 43 and her criminal history category as III, the United States Probation Office ("Probation") has computed a Guidelines sentence in this case to include a term of incarceration for life (capped at the statutory maximum, 1,080 months) and supervised release from five years to life.

The government agrees with Probation's calculation of the defendant's Offense Level and Criminal History Category and thus agrees with its determination of her Guidelines Sentencing Range (GSR) as outlined above.  At the time of this filing, the defendant has not submitted objections to the PSR; the government expects to address any objections raised in the defendant's sentencing memorandum at the sentencing hearing.

### II.    Application of the Section 3553(a) Factors

Based on an evaluation of all of the § 3553(a) factors, the government submits that its recommended sentence is a fair one that appropriately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; affords adequate deterrence to criminal conduct; and protects the public.

The conduct at issue here is abhorrent. These were children who were not yet fully potty trained, not old enough to even go to the bathroom themselves, and not fully verbal. This was not a "crime of opportunity" in the sense in which we typically think of that concept. This was planned, it was strategized, and it was carried out for the sexual gratification of one or both defendants in this case. Each codefendant points the finger at the other as the driver for the conduct – that is, as the one who was sexually interested in children. In assessing Groves's culpability, it should not matter which of the defendants was truly sexually interested in the children, because Groves is the one who had an actual relationship with the children and their families.

Defendant Laughton, however, is situated differently. She talked extensively throughout their messages about potential or fantasized sexual contact with kids. *See, e.g.*, Gov. Sent. Mem. Exh. B-6. Groves, of course, was in a position of trust that facilitated Laughton's access to the toddler victims here. Without Groves's access, this crime would not have been possible. But that fact does not mitigate Laughton's culpability. As demonstrated in the text communications, the defendant's voice was, to put it mildly, the more prominent one in the ongoing conversation regarding the sexual exploitation of the victims in this case. To be clear: Groves was an active participant and is not a victim. She knew what she was doing was wrong and that, at minimum, her career would be in jeopardy if they were found out. But the defendant's borderline obsessive focus on sex throughout the weeks of communications that she deleted from her phone demonstrate that she was, in large part, the driver of this conduct. *See generally* Gov. Sent. Mem. Exh. A and B-3 (selected messages).

For example, on June 7, 2023, at 2:39PM, they exchanged the following messages:

> GROVES: I'm horny right now
>
> LAUGHTON: I was asking because I know we've had some back-and-forth and I know we initially said we do nothing with kids ever again and you said you were afraid that if we had kids if they would go back and tell the parents the same with the kids you work with when I was trying to ask you do you seriously see no

problem with sex with children like I had always wanted to put my dick inside one of the little girls you work with, but you said they were too little and then you said I could so I don't know I know you're horny I'm trying to get clean and I already have the hot water running baby.

GROVES: I want to do it with the kids at work

GROVES: than you can put your dick inside them

GROVES: I wasn't being serious about the kids running back and telling their parents

GROVES: Plus I want to do it with kids who use to come here cause they can enjoy it

LAUGHTON: Well, I know but you were afraid that the kids at work might tell their parents and we said we would do it if we knew we were not gonna get caught and I was just wondering like like basically you have no problem with that…

………………

GROVES: You mentioned how I said I was afraid that the kids will run to the parents if we do it with them I wasn't being serious

LAUGHTON: OK because like I get concerned about that cause I don't wanna get caught if we do

GROVES: I was joking anyway and you took me serious

LAUGHTON: Oh I know but I just don't wanna get in trouble. I mean I want to do what we want to do because we like it and we approve of it but others think this is wrong. Lots of parents don't like people touching their kids and it is against the law

PSR ¶ 27.

As in this exchange, the defendant often tempers her unequivocally-stated sexual interest in the children with an ever-present interest in self-preservation. But she keeps coming back to the kids. On June 13, 2023, they engaged in the following exchange:

LAUGHTON: I want to pass baby please
GROVES: No
GROVES: I took these for you today so I'm horny
LAUGHTON: Oh you said sexting
LAUGHTON: Is that a little girl
GROVES: I wasn't being serious

5

GROVES: Yes that's a little girl

LAUGHTON: I like that I would like to see more of the pussy but I like that it fucking hot

LAUGHTON: Is that one of the girls we get to play with

LAUGHTON: That little boy pulling up his shirt looks like

GROVES: The boy was getting a diaper on that's why his shirt is up

LAUGHTON: Oh

LAUGHTON: Did the girl give you an issue

GROVES: No

GROVES: The boy didn't either

…

LAUGHTON: That girl looks sweet

GROVES: Yeah

LAUGHTON: Do you think she would like sucking me and me rubbing my dick on her?

GROVES: Yeah

LAUGHTON: It's just a bummer she wont let me put my dick inside of her

GROVES: She's not even 3 yet

LAUGHTON: Yeah, I know

LAUGHTON: I mean, I didn't take my dick was that big but I guess at that age that is a little too young

GROVES: Yes

LAUGHTON: So that none of the girls there I would be able to put my dick in

GROVES: No

LAUGHTON: The girl that used to go there that you know her parents would I be able to put my dick in her?

GROVES: Yes

PSR ¶ 15.

Furthermore, the defendant explicitly directed Groves's actions with respect to the exploitation of Minor 1, Minor 2, and Minor 3. *See* PSR ¶ 16 ("I also need to be honest I mean yes that picture was hot of that little boy but you probably have gotten the picture by now that I prefer a little girls, but he is cute. I'd like to see you put your hand around his penis."), ¶ 17 ("If you take one or 2 today can you hold the dick or put your finger in the girl").

The defendant should, accordingly, be punished more severely than Groves, taking into account Groves's history and characteristics, which are largely mitigating.[4] The government has considered defendant Laughton's history and characteristics, as they are outlined in the PSR. This information is not mitigating. The defendant's criminal history reflects a theme: entitlement, aggression, and manipulation. *See* PSR ¶ 88 (homeless defendant slapped and grabbed the crotch of friend at whose house defendant was staying, "by accident"); ¶ 89 (defendant lied about slashing victim's tires until confronted with surveillance video); ¶ 90 (defendant called 911 for ambulance when taxi not available); ¶ 91 (defendant falsely accused victim from ¶ 89 of assault); ¶ 92 (defendant and wife fraudulently opened credit card in third party's name and lied about it until confronted with physical and documentary evidence); ¶ 95 (defendant threatened victim from ¶ 89 with knife); ¶ 98 (defendant made bomb threat to hospital because of frustration with purported misdiagnosis, and deleted call logs); ¶ 100 (defendant made several false 911 calls/texts); and ¶ 101 (defendant violated Stalking Protection Order held by Groves by publicly accusing Groves on Facebook[5] of sexual attraction to and taking inappropriate pictures of children at the childcare facility in Tyngsborough).

The defendant's communications with Groves are also defined by an undercurrent of entitlement and manipulation. While it appears that Groves initiated the renewed contact, the defendant barreled full steam ahead after ensuring that Groves was not setting a trap for her, given that a Stalking Protection Order prohibited Laughton's contact with Groves. *See* Gov. Sent. Mem.

---

[4] Given the Court's level of familiarity with the facts of this case, the government trusts that the order in which the sentencing hearings are convened will not benefit or disadvantage either defendant.

[5] It is clear from the messages in the instant case that the defendant later convinced Groves that the defendant's Facebook account had been hacked – that is, that the defendant was not the one who had posted the accusation. *See* Gov. Sent. Mem. Exh. B-1.

Exh. B-1.   Once the defendant had that assurance, she launched into discussions that prompted Groves to help support the defendant financially and then transitioned to constant discussion of past sexual escapades, plans for their future sexual encounters, and fantasy (including discussion of sex with family members).   *See* Gov. Sent. Mem. Exh. B-2.   Included within the sexual dimension of their communications, of course, was the capitalization on Groves's access to the children at the childcare facility.   Again, Groves is an equal, active participant in the conversations (and in fact, precipitates the breakup by standing up for herself and calling out the defendant's flaws, *see* Gov. Sent. Mem. Exh. B-4, B-5); but, by volume, defendant Laughton carries the conversation.   Whether the defendant truly planned to have sexual contact with the kids if granted the opportunity or was "merely" fantasizing is of little consequence to the assessment of her dangerousness and culpability; the harm she and her codefendant caused has been done.   The victims' families suffer regardless.   No parent should have to "carry the heavy burden of wondering how [they] will ever find the words to explain this to [their child] when he gets older."   *See* Victim impact statement, Minor 3 (filed under seal).   Nor should they ever have to second-guess leaving their children in the care of others, or constantly worry about the possibility that the images may have been shared, stored, or circulated beyond what law enforcement has been able to determine. *See* Victim impact statement, Minor 2 (filed under seal).

While the imagery recovered in this case does not involve the sexual abuse of the toddler victims, it does implicate their physical safety.   That is, this is not a case where, for example, an adult convinced a teenaged minor to self-produce imagery of themselves engaged in sexually explicit conduct; the crimes here involved Groves literally removing defenseless children from the watchful eyes of other caretakers in order to undress them and photograph them.   This involves a physical violation.   In other cases involving hands-on offending by defendants charged with violations of 18 U.S.C. § 2251, courts in this district have often imposed sentences reflective of

the seriousness of such offenses. *See*, *e.g.*, *United States v. Joyner,* 24-CR-10057-DJC (unemployed defendant who produced child pornography of daughter with developmental delays over whom he had sole custody sentenced to 22 years, with government recommending 45 years); *United States v. Ubeda,* 23-CR-30016-BEM (defendant who extorted third party into producing child pornography with her son sentenced to 40 years consecutive to 10 year state sentence for similar conduct); *United States v. Benoit*, 22-CR-30014-MGM (defendant with no scored criminal history sentenced to 46 years for producing child pornography of two minor children, including daughter, and possessing hundreds of other files of child pornography; government recommended 55 years); *United States v. Raymond*, 20-CR-10222-RGS (government recommended, and court imposed, 60 year sentence for 65-year-old defendant with no record for producing child pornography depicting her sexual assaults of two minors and surreptitiously recording others); *United States v. Nieves*, 19-CR-10367-DJC (21-year-old transgender defendant with significant history of abuse and self-harm and no record sentenced to 30 years for producing and distributing child pornography depicting her hands-on abuse of child known to her; government recommended 40 years); *United States v. Decarolis*, 19-cr-40038-TSH (defendant who produced child pornography involving five minors sentenced to 38 years); U*nited States v. Sheehan*, 18-CR-10391-RGS (50-year-old defendant with no record who produced child pornography involving her sexual assault of three minors sentenced to 45 years; government recommended 60 years. Defendant was later resentenced to 17 years following remand on appeal overturning denial of motion to suppress); *United States v. Lee*, 18-cr-10105-IT (defendant who used messaging application to direct New Hampshire male to produce specific child pornography depicting sexual abuse of child known to that person sentenced to 20 years; defendant who sexually abused the child in producing the material sentenced to 50 years in D.N.H. in 18-cr-00004-LM); *United States v. Anthony DeOrdio*, 18-cr-30056-MGM (defendant who created child pornography depicting

sexual abuse of one child known to him after having been previously convicted of a child pornography offense sentenced to 50 years); *United States v. Jonathan Monson*, 18-cr-30015-MGM (defendant who created child pornography depicting sexual abuse of one child known to him sentenced to 40 years); *United States v. Toronto*, 17-cr-10307-FDS (defendant who produced child pornography depicting sexual abuse of two children known to him sentenced to 40 years); *United States v. Germaine*, 17-cr-30010-ADB (defendant who created child pornography depicting sexual abuse of one child known to him sentenced to 35 years pursuant to plea agreement).  Here, the physical violation is forever memorialized in the imagery that Groves created for the defendant.

These comparisons are not perfect, but they demonstrate that across the district, courts react seriously to serious crimes like this one, where local children are taken advantage of by people in whom they trust.  While the defendant did not know the children or their parents personally, as Groves did, she used Groves's access to the children, which was predicated on their trust in her. Laughton herself had recently occupied a position of public trust as an elected official, held herself out as a "reverend," and aspired to be the voice of the community as a radio personality.  These aspirations reveal delusions of grandeur that are completely at odds with her demonstrated pattern of criminality, manipulation, and inability to take responsibility for her actions.  She must be held responsible for the damage that she has done.

## CONCLUSION

This is one of the most serious crimes that is prosecuted in federal court.  It should be treated as such. There is no reason to believe that anything but a truly lengthy term in prison (which, for this defendant, might very well be for a large portion of her adult life) will deter the defendant and others from committing similar offenses in the future.

The government recognizes that it is always difficult to quantify in months or years how

10

much is "sufficient" to achieve the goals of sentencing.  In this case, that calculus leads to a term of years that will incapacitate the defendant.  While the government's recommended sentence here is significant in length, it is not only reasonable, but also necessary in this case to promote respect for the law, to adequately punish the defendant for her criminal conduct, to deter her and others from offending in the same ways again, and for long-term protection of the public.

For all of the foregoing reasons, the government respectfully recommends that this Court impose a sentence of 40 years' imprisonment, to be followed by five years of supervised release. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

Respectfully Submitted,

LEAH B. FOLEY
United States Attorney

Date: June 2, 2026          By:    /s/ Anne Paruti_____
                                   Anne Paruti
                                   Jessica L. Soto
                                   Assistant United States Attorneys
                                   United States Attorney's Office
                                   One Courthouse Way
                                   Boston, MA 02210
                                   617-748-3100


## CERTIFICATE OF SERVICE

I, Anne Paruti, hereby certify that this memorandum and unsealed exhibits were filed through the Electronic Court filing system and will be sent electronically to the registered participants identified on the Notice of Electronic filing.


Date: June 2, 2026                              /s/ Anne Paruti_____
                                                Anne Paruti
                                                Assistant United States Attorney